# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

SOUTHWEST GEORGIA  
FINANCIAL CORPORATION and  
EMPIRE FINANCIAL SERVICES,  
INC.,

    Plaintiffs,

    v.  :  Civil Action No. 7:08-cv-55(HL)

COLONIAL AMERICAN CASUALTY  
AND SURETY COMPANY,

    Defendant.

_____

# ORDER

This matter is before the Court on the cross-motions for summary judgment of Plaintiffs Southwest Georgia Financial Corporation ("Plaintiff SGFC") and Empire Financial Services, Inc. ("Plaintiff Empire") and Defendant Colonial American Casualty and Surety Company. In its Motion for Summary Judgment (Doc. 53), Defendant contends that it is entitled to judgment as a matter of law as to all claims against it. Plaintiffs have countered with their own Motion for Summary Judgment (Doc. 55), in which they contend they are entitled to judgment against Defendant as a matter of law. After review of the pleadings, the discovery and disclosure materials on file, and the parties' briefs, the Court denies the motion of Plaintiffs and grants the motion of Defendant.

I.  **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

II. **FACTS**

Plaintiff Empire is a mortgage bank. In late 2005 and early 2006, Plaintiff Empire worked with a real estate developer, Farbod Zohouri ("Zohouri"), to purchase and develop two apartment complexes in the Atlanta area. The purpose of both projects was conversion to condominiums. One project was known as Asbury Commons; the other was called Henderson Mill. Plaintiff Empire provided one loan to Zohouri Developments Asbury Commons, LLC and another loan to Henderson Mill, LLC.

Several banks purchased participation interests in the loans that Empire made to the Zohouri LLCs. In other words, each bank agreed to fund a certain percentage of the loan, for which the bank was to receive a repayment of the funded principal, along with interest.[1] Each of the Asbury Commons and Henderson Mill participating

---

[1] Bank of Dudley, Century Bank and Trust, Citizens Bank & Savings Company, First Coweta Bank, First National Bank-Barnesville, Flint River National Bank, Georgia Trust Bank, The Gordon Bank, The Palmetto Bank-Greenwood, The Peoples Bank & Trust Co.-Auburn, and Plaintiff SGFC participated in the Asbury Commons loan.

The Palmetto Bank-Greenwood, Pinnacle Bank, Flint River National Bank, First Citizens Bank, Georgia Heritage Bank, Farmers & Merchants Bank, The Bank of Soperton, Vidalia Federal Savings & Loan Association, and Bank Independent participated in the

banks executed a similar Adjustable Loan Participation Sales and Servicing Agreement in conjunction with funding its proportionate share of the loan.[2]

As a part of the information provided to the participating banks, Plaintiff Empire identified a requirement for 30% pre-sale contracts on each project as a condition of loan funding. Empire's Executive Vice President, Bill Osborne, however, omitted this pre-sale requirement from both of the loan commitment letters signed by Zohouri, as

---

Henderson Mill loan.

[2]The Court notes at the outset that both parties have taken extensive liberties when alleging that all of the participating banks acted in one manner or another. For example, Plaintiffs state in their Statement of Undisputed Material Facts (Doc. 56) that "[t]he Participating Banks believed that Empire and/or Osborne were negligent; had breached their duties owed to the Participating Banks; and had made misrepresentations to the Participating Banks." (¶ 45). This statement leads the Court to believe that there is evidence showing that all sixteen participating banks on the two projects thought that Plaintiff Empire and/or Osborne acted improperly. Plaintiffs cite to the deposition testimony of four bank officers, the affidavit of one bank officer, and the complaint filed by Bank Independent to support their proposition that all of the participating banks had a problem with Plaintiff Empire's and/or Osborne's actions. This leaves ten banks unaccounted for.

A review of the deposition testimony filed in this case shows that Plaintiffs' broad categorization of all of the participating banks "feelings" and "beliefs" is not in fact supported by the evidence. For instance, Scott Gatlin, President and CEO of Flint River National Bank, testified that the bank did not feel that Plaintiff Empire was negligent in its handling of the Henderson Mill loan. (Gatlin Dep., p. 31). Jim Gillis, President and CEO of the Bank of Soperton, also testified that he did not feel Plaintiff Empire was negligent in handling the Henderson Mill loan. (Gillis Dep., p. 37). Along those same lines, Julian Lane, President and CEO of First Citizens Bank, testified that he was not displeased with how Plaintiff Empire originally closed the Zohouri loan. (Lane Dep., p. 117).

This statement of fact, however, is not the only overreaching statement made by the parties with regard to the participating banks. The Court has taken notice of these liberties during its review of the parties' Motions and supporting documents.

well as the loan closing instructions provided to Empire's attorney. Osborne was not authorized to make this change to the loan documents.

The Asbury Commons and Henderson Mill loans closed in March, 2006. In mid-2006, Plaintiff Empire became aware that Osborne did not secure the pre-sale contracts on Asbury Commons that the credit underwriting letter required him to secure.[3] In the loan agreement Zohouri actually signed, Osborne changed, without Plaintiff Empire's approval, the pre-sale before funding requirement to a pre-sale before conversion to condominiums requirement. Both loans were closed without receipt of the pre-sale contracts. Plaintiff Empire also became aware during this time period that Zohouri was being investigated by the Federal Bureau of Investigation ("FBI"), and on September 26, 2006, advised all of the participating banks of the FBI investigation.

Both the Asbury Commons and Henderson Mill loans performed until October, 2006. Zohouri then defaulted on the loans by failing to make a payment. On October 16, 2006, Plaintiff Empire placed the two loans into a state of default. The foreclosure date for the Asbury Commons and Henderson Mill properties was July 3, 2007.

The properties were eventually sold, both for less than the outstanding loan amounts. Following the foreclosure sales, the participating banks submitted to Plaintiff Empire what Plaintiffs refer to as "demands," requesting either return of the principal advanced to Plaintiff Empire, principal, interest, and fees incurred as a result of the

---

[3]While Plaintiff Empire received some pre-sale contracts on Henderson Mill after the closing of the loan, those contracts were later determined to be unenforceable.

Zohouri transactions, or the payment of unspecified damages which happened to equal the outstanding principal balanced owed to the participating banks. With the exception of the initial demand made by Bank Independent, one of the Henderson Mill participating banks, none of the demands made any reference to Osborne or the failure to obtain the pre-sale contracts.

Each participating bank was paid a pro rata share of the foreclosure sale proceeds according to the terms of the participation agreements. Even though the participating banks were not technically entitled to any additional money under the participation agreements once the sale proceeds were distributed, Plaintiff Empire paid additional money to the participating banks in exchange for a release of Empire from all claims arising from the Zohouri matter. Plaintiff Empire consummated settlements with the Asbury Commons participating banks for a total of $1,368,171.18 on or about December 17, 2007.[4] Plaintiff Empire consummated settlements with the Henderson Mill participating banks for a total of $847,241.14 in August, 2008. Bank Independent was not provided with any settlement funds at that time because it had previously filed a lawsuit against Plaintiff Empire. That case eventually settled, with Plaintiffs paying $207,000 to Bank Independent. The total amount paid by Plaintiffs on both projects was $2,422,412.

---

[4] While SGFC was a participant in Asbury Commons, Plaintiff Empire is not seeking to recover from Defendant the amount it paid SGFC. The $1,368,171.18 paid to the Asbury Commons participating banks does not include any money paid to SGFC.

Plaintiffs were insured under a "D & O Selectplus Insurance Policy" (the "Policy") issued by Defendant in 2003. This policy served to insure Plaintiffs against, among other things, any wrongful acts committed by Plaintiffs, their directors, or their officers. Plaintiffs submitted a claim to Defendant seeking reimbursement of the payments made to the participating banks. Defendant denied coverage for the payments. On April 25, 2008, Plaintiffs filed this action against Defendant.[5]

### III.  THE POLICY

Section 1(C) of the Policy provides that "if, during the **policy period**, any **claims** are first made against the **Company** for a **wrongful act**, the Insurer will pay on behalf of the **Company** all **loss** resulting therefrom."[6]  The terms are defined as follows:

> **Claim** (Section 3(B)) - a **director and officer claim**, **an entity claim**, **an employment practices claim**, **a lenders' liability claim**, **a securities claim** and **a trust department claim**.

\*\*\*\*\*\*\*\*\*\*

> **Loss** (Section 3(L)) - any amount which any **Insured** is legally obligated to pay as a result of a **claim**, including damages, judgments, settlements and **defense expenses**;....

\*\*\*\*\*\*\*\*\*\*

---

[5] Plaintiffs filed their First Amended Complaint (Doc. 6) on June 19, 2008, and their Second Amended Complaint (Doc. 48) on April 21, 2009.

[6] While the Policy also provides coverage for claims made against the directors and officers of the insured company, the claims here were all made against Plaintiff Empire, making Section 1(C) the only insuring clause potentially applicable to this case.

**Wrongful act** (Section 3(S)) -

(1)    any actual or alleged act, error, neglect, omission, misstatement, misleading statement or breach of duty which shall have been committed or attempted, or which shall be alleged to have been committed or attempted

>    (a)    by a **Director or Officer** acting in their capacity as such or, subject to SECTION 2(A), in his or her capacity as a director, officer, member, manager, trustee, regent or governor of a not-for-profit organization;
>
>    (b)    with respect to the coverage provided under SECTION 2(C), by an employee of the **Company** acting in his or her capacity as such; or
>
>    (c)    with respect to the coverage provided under SECTION 1(C) (if so indicated on the Declarations), by the **Company**; or

(2)    any matter claimed against a **Director or Officer** solely by reason of his status as a director or officer of the **Company**.

## IV.    DISCUSSION

Construction of terms in a contract is ordinarily a question of law for the court. O.C.G.A. § 13-2-1. If the language of a contract is clear and unambiguous, "the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning." Lostocco v. D'Eramo, 238 Ga. App. 269, 275, 518 S.E.2d 690 (1999) (internal citation omitted). "Ambiguity exists when the meaning is uncertain, and the language may be fairly understood in more than one way." Id.

The unambiguous language of the Policy states that Defendant will be responsible for paying losses resulting from wrongful acts claimed against Plaintiffs.

According to Plaintiffs, the wrongful acts leading to the losses eventually paid by Plaintiff Empire were Plaintiff Empire's and/or Osborne's negligence, breach of duty, and misrepresentations with regard to the alleged deviation from the approval criteria for the origination of the loans.[7]  The Court disagrees.  The evidence shows that the reason for any loss sustained by the participating banks, and subsequently paid for by Plaintiff Empire, was Zohouri's lack of liquidity and default on the loans.  The participating banks' losses resulted from the default and the downturn in the economy and real estate market.  Plaintiff Empire actually believed the participating banks were "better off without the contracts..." after the default, as the "current situation [gave it] the flexibility to market the property both as apartments and as a condo conversion project."

One of the risks for a lender is that the borrower will not be able to repay the monies provided.  That is exactly what happened in this case.  Had Zohouri not

---

[7]The Court cannot help but note the contradictory positions taken by Plaintiffs in this case and the Bank Independent case filed in the Northern District of Alabama.  <u>Bank Independent v. Empire Fin. Servs., Inc.</u>, Case No. 3:08-cv-00981.  The matters in both cases arose under the exact same facts, but when Bank Independent claimed Plaintiff Empire breached its contract with Bank Independent by not securing the pre-sale contracts, and also that Plaintiff Empire was liable for misrepresentation, suppression, negligence, and breach of fiduciary duties, the same actions Plaintiffs contend caused the losses in this case, Plaintiff Empire argued that the participation agreement's merger clause prohibited the four tort claims because those causes of action were based on Bank Independent's reliance on prior representations and warranties by Plaintiff Empire before the execution of the participation agreement, which does not provide any requirements concerning the pre-sale of any units. (Defendant's Memorandum in Support of Motion to Dismiss or Stay This Action; Defendant's Reply to its Motion to Dismiss or Stay This Action).  The participation agreements signed by the other participating banks contained the same merger clause, which, according to Plaintiff Empire, would preclude the participating banks from maintaining a lawsuit anyway.

defaulted on the loans, or had Plaintiff Empire been able to sell the properties after foreclosure for greater amounts, the participating banks would have suffered no loss, and therefore would have had no claim against Plaintiff Empire, even though the pre-sale contracts were not secured. No matter how negligent Osborne's or Plaintiff Empire's actions were, the participating banks suffered losses because Zohouri could not repay the loans. As testified to by David Dyer, the former president and CEO of Plaintiff Empire, whether or not the pre-sale contracts existed would not have mattered in terms of Zohouri's ability to continue to service the loan. The purpose of a liability policy is not to protect Plaintiffs against risks in the marketplace. Unfortunately in this case, those risks manifested themselves in the form of a borrower who defaulted on a loan and a marketplace where the collateral securing the loans could not be sold for an amount equal to or greater than the outstanding loan amounts.

"Under Georgia law, an insurance company is free to fix the terms of its policies as it sees fit, so long as such terms are not contrary to law, and it is equally free to insure against certain risks while excluding others." Continental Cas. Co. v. H.S.I. Fin. Servs., Inc., 266 Ga. 260, 262, 466 S.E.2d 4 (1996). "Courts have no more right by strained construction to make an insurance policy more beneficial by extending the coverage contracted for than they would have to increase the amount of coverage." Capitol Indem., Inc. v. Brown, 260 Ga. App. 863, 865, 581 S.E.2d 339 (2003). Plaintiffs have not shown that the terms of the policy are contrary to law. The Policy must be

applied as it is written, and as written, and under the facts before the Court, the Policy does not provide coverage.

### V.  CONCLUSION

Accordingly, Plaintiffs Southwest Georgia Financial Corporation and Empire Financial Services, Inc.'s Motion for Summary Judgment (Doc. 55) is **DENIED** and Defendant Colonial American Casualty and Surety Company's Motion for Summary Judgment (Doc. 53) is **GRANTED**.  The Motion to Strike filed by Plaintiffs (Doc. 115) and the Motion to Strike filed by Defendant (Doc. 117) are both **DENIED**.

**SO ORDERED**, this the 21st day of September, 2009.

/s/ Hugh Lawson
**HUGH LAWSON, SENIOR JUDGE**

mbh